**IN THE COURT OF COMMON PLEAS, SUMMIT COUNTY, OHIO**

CASE NUMBER: CV-2012-03-1727

VICTOR C. MILLER
1844 AKINS RD
Broadview Heights, OH 44147
Primary Plaintiff

-VS-

**SUMMONS**

HUNTINGTON NATIONAL BANK
MERGER TO FIRST NATIONAL BANK OF ZANESVILLE,
917  EUCLID AAVE
Cleveland, OH 44115
Primary Defendant

**TO the following:** HUNTINGTON NATIONAL BANK
MERGER TO FIRST NATIONAL BANK OF ZANESVILLE,
917  EUCLID AAVE
Cleveland, OH 44115

You have been named as a defendant(s) in a complaint filed in the Summit County Court of Common Pleas, Summit County Courthouse 205 S. High St., Akron Ohio, 44308.

A copy of the COMPLAINT is attached hereto. The name and address of the Plaintiff's attorney is:

DANIEL GLENN MORRIS
950 STANDARD BUILDING
CLEVELAND, OH 44113

**You are hereby summoned and required to serve upon the attorney listed above, or upon the party, if they have no attorney of record, a copy of an answer to the COMPLAINT within twenty-eight (28) days after service of this summon on you, exclusive of the day of service. Your answer must be filed with the Court within three days after the service of a copy of the answer on the attorney, or upon the party, if there is no attorney of record**

**If you fail to appear and defend, judgment by default may be rendered against you for the relief demanded in the COMPLAINT.**

Daniel M. Horrigan                       , Clerk, Court Of Common Pleas, Summit County, Ohio.

By s/ MD                    04/12/2012



2. Article Number

7196 9008 9111 3699 4386

3. Service Type   CERTIFIED MAIL™

4. Restricted Delivery? (Extra Fee)   ☐ Yes

1. Article Addressed to:

CV-2012-03-1727

HUNTINGTON NATIONAL BANK
MERGER TO FIRST NATIONAL BANK OF ZANESVILLE,
917 EUCLID AAVE
Cleveland, OH 44115

COMPLETE THIS SECTION ON DELIVERY

A. Received by (Please Print Clearly)   B. Date of Delivery

C. Signature
X   ☐ Agent   ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

PS Form 3811, January 2005          Domestic Return Receipt

## IN THE COURT OF COMMON PLEAS
## SUMMIT COUNTY, OHIO

JEROME J. AND FRANCES L. PATE )
9232 CHAMBERLIN RD. )
 TWINSBURG., OH  44087 )
  )
  )     JUDGE:  MARY M.  ROWLANDS
AND )
  )
RONALD ALPLANALP )
10911 BROOKVIEW  DR. )
BRECKSVILLE, OHIO  44141 )     CASE NO.:  2012 03 1727
  )
AND )
  )
GENE L. AUNGST )
670 GORDON RD. )
MANSFIELD, OH  49905 )
  )
AND )
  )
ANN M. BOLDIN )     **AMENDED CLASS ACTION**
7166 MENTOR AVE., APT. #67 )     **COMPLAINT**
WILLOUGHBY, OHIO  44094 )     (FOR MONEY DAMAGES ONLY)
  )
AND )     (JURY DEMAND ENDORSED
  )     HEREON)
JOANNE BEIFUS )
6135 TIFFIN COURT )
MENTOR,  OH  44060 )
  )
AND )
  )
RITA BRODNIK )
1675 OVERLOOK DR+ )
LYNDHURST, OH  444124 )
  )
AND )
  )
G. MURRAY CALDWELL )
518 GREEN BRIDGE LN. )
PROSPECT HTS., IL  60070 )
  )
AND )
  )
CLAUDE D. & DONEVA G. COLE )

2012 APR 11  AM 9: 38
DANIEL M. HORRIGAN
SUMMIT COUNTY
CLERK OF COURTS

1

8240 S, BREEDEN RD.                    )
BLOOMINGTON, IN  47403                 )
                                       )
AND                                    )
                                       )
THOMAS G. CORWIN, JR.                  )
4794 ODIN'S WAY, NE                    )
MARIETTA, GA  30068-1652               )
                                       )
AND                                    )
WILHANA B. COX                         )
893 GREEN CHAPEL RD.                   )
BLOOMFIELD, KY  40008-7221             )
                                       )
AND                                    )
                                       )
JOHN S. DAUER, JR.                     )
4703 CASCADE AVE.                      )
ROCK HILL, SC  29732                   )
                                       )
AND                                    )
                                       )
CHARLES L. DAVIS                       )
1897 N. WATER ST. EXT.                 )
UHRICHSVILLE, OH  44683                )
                                       )
AND                                    )
                                       )
FRANCES S. DEVORE                      )
161 MILLS DR.                          )
LOUISVILLE, KY  40216                  )
                                       )
AND                                    )
                                       )
MARGARET R. FETTER                     )
HCR 65, BOX 193                        )
ST. MEINRAD,  IN  47577                )
                                       )
AND                                    )
                                       )
RON FISHER                             )
9987 N. CROSS ST.                      )
ODON, IN  47562                        )
                                       )
AND                                    )
                                       )

2

LEONA FRANKS )
17009 VALLEY RD. )
CHAGRIN FALLS, OH 44023 )
)
AND )
)
DOROTHY FRESCHLY )
5275 N. OLD STATE RD. )
ROCKPORT, IN 47635-8951 )
)
AND )
)
GEORGE AND MARTHA GLAUBER )
25300 HILLTOP DR. )
BEACHWOOD, OH 44122-1359 )
)
AND )
)
NAN GOLDEN )
38322 ROSELAWN )
WILLOUGHBY, OH 44094 )
)
AND )
)
ARLENE A. GUERIN )
5931 WOODSIDE RD. )
HIGHLAND HTS., OH 44143 )
)
AND )
)
MARY E. & JOSEPH R. ENLEY )
2173 S. ENLEY ROAD )
WHEATLAND, IN 47597 )
)
AND )
)
IRA AND DONALD IRWIN )
6545 EAST SPARTA AVE. )
EAST SPARTA, OH 44626 )
AND )
)
ELDIVA P. HAWKINS )
WAVES MILL RD., BOX 182 )
MIDVALE, OH 44653-0182 )
)
AND )

DENNIS P. & ROBYN R. HORGAN )
17914 MAPLECLIFF )
CLEVELAND, OH  44119 )
)
AND )
)
THE DEORDORFF TRUST )
C/O MARILYN DEARDORFF KEFFER, )
TRUSTEE )
106 PROVIDENCE, SE )
NEW PHILADELPHIA, OH  44663 )
)
AND )
)
THE SEWING BOUTIQUE )
C/O MARILYN KEFFER, PRESIDENT )
106 PROVIDENCE, SE )
NEW PHILADEPHIA, OH  44663 )
)
AND )
)
SAMUEL G. KEFFER )
106 PROVIDENCE, SE )
NEW PHILADELPHIA, OH  44663 )
)
AND )
)
SAVIE KLIENERMAN )
1545 EAST 31ST  STREET )
C;LEVELAND, OHIO  44114 )
)
AND )
)
ANNEMARIE KONTE )
928 E. 214TH ST. )
EUCLID, OH  44119 )
)
AND )
)
ARLENE KORNBAU )
9595 E. FAIRWAY BLVD. )
SUN LAKES, AZ  85248 )
)
AND )
)

4

STK LTD.                                    )
C/O DON KREADY, PRESIDENT                   )
1085 VILLA VISTA                            )
COLBY, KS  67701                            )
                                            )
AND                                         )
                                            )
CHARLES & CLARA KREILEIN                    )
1001 E. HASENOUR AVE.                       )
JASPER, IN  47546                           )
                                            )
AND                                         )
                                            )
CHARLES LEONHARD                            )
6680 LEONHARD HILL RD., S.W. TP 191         )
PORT WASHINGTON, OH  43837                  )
                                            )
AND                                         )
                                            )
PAULINE LIERSEMAN                           )
1169 EASTVIEW DR.                           )
MANSFIELD, OH  44905                        )
                                            )
AND                                         )
                                            )
MARGARET LOYD                               )
R.R. 1   BOX 170                            )
WASHINGTON, IN  47501                       )
                                            )
AND                                         )
                                            )
GAIL LYTHOS (individually and as            )
the heir to Nicholas Lythos)                )
5593 KILLBOURNE DR.                         )
CLEVELAND, OH  44124-3829                   )
                                            )
AND                                         )
                                            )
DANIEL L. LUEBBEHUSEN                        )
P.O. BOX 221                                )
FERDINAND, IN  47532-0221                   )
                                            )
AND                                         )
                                            )
ROBERT J. LUEKEN                            )
625 DELEWARE                                )

5

FERDINAND, IN  47532                          )
JACQUELINE L. MATTISON                        )
1949 CHALICE WAY                              )
TOLEDO, OH  43613                             )
                                              )
AND                                           )
                                              )
ROSEMARY MAYHORN                              )
401 NE 19TH ST.                          )
WASHINGTON, IN  47501                         )
                                              )
AND                                           )
                                              )
PATRICK M. & KIM A. MCCAFFERTY                )
4839 THOROUGHBRED LOOP                        )
ERIE, PA  16506                               )
                                              )
AND                                           )
                                              )
LAWRENCE R. MCCAULIFF                         )
443 METCALF                                   )
ELYRIA, OH  44212                             )
                                              )
AND                                           )
                                              )
FRANCES MERKEL                                )
1923 N. CELESTINE RD., N. 634-1176            )
CELESTINE, IN  47521                          )
                                              )
AND                                           )
                                              )
DAVID C.  & RENEE MILLER                      )
465 DIAMOND COURT                             )
BRUNSWICK HILLS, OH  44212                    )
                                              )
AND                                           )
                                              )
VICTOR C. MILLER                              )
1844 AKINS ROAD                               )
BROADVIEW HEIGHTS, OH  44147                  )
AND                                           )
                                              )
GLENN A. NEWTON                               )
1900 PARKDALE DRIVE                           )
WASHINGTON, IN  47501                         )
                                              )

AND                                                )
                                                   )
PAULA PALOTAS (individually and as heir to         )
Dennis Palotas, deceased)                          )
3045 BROAD VISTA ST., N.W.                         )
UNIONTOWN, OH  444685                              )
                                                   )
AND                                                )
                                                   )
ELEANOR PAWLAK                                     )
1088 BROOKINGS DR.                                 )
MORGANTOWN, W. VA.  26508-8762                      )
                                                   )
AND                                                )
                                                   )
TED W. POLKA                                       )
1120 COMMERCIAL AVE., SW                           )
NEW PHILADELPHIA, OH  44663                         )
                                                   )
AND                                                )
                                                   )
GIZELLA M. POULOS                                  )
20650 CENTURY WAY, DR.                             )
MAPLE HEIGHTS, OH  44137                            )
                                                   )
AND                                                )
                                                   )
FR. JOSEPH R. RADVANSKY                            )
506 MAIN ST.                                       )
MARBLEHEAD, OH  43440                               )
                                                   )
AND                                                )
                                                   )
ELNORA REAVES                                      )
3277 VAN AKEN BLVD.                                )
SHAKER HTS., OH  44120-3507                         )
                                                   )
AND                                                )
                                                   )
                                                   )
CORA C. ROY                                        )
200 CHATHAM WAY, APT. 744                          )
MAYFIELD HEIGHTS, OH  44124                         )
                                                   )
AND                                                )
                                                   )

7

RUTH L. SINGLETON )
130 E. WALNUT )
PAINESVILLE, OH 44077 )
)
AND )
)
R. SCOTT AND DINA G. SHUSS )
8880 TSCHUDY HILL RD. )
PORT WASHINGTON, OH 43837 )
)
AND )
)
ST. PETER'S LUTHERAN CHURCH )
C/O DOROTHY A. BRANDT, )
COUNCILMEMBER )
3823 ANDERSON HILL RD., SW )
NEW PHILADELPHIA, OH 43837 )
)
AND )
)
EARL C. SNELL )
7930 HIGHWAY 1003 )
SOMERSET, KY 42501 )
AND )
)
VIRGINIA COLLINS SNIDER )
115 SYLVAN DR. )
BARDSTOWN, KY 40004 )
)
AND )
)
WILLIAM H. STONECIPHER (individually )
And as the heir to Eula L. Stonecipher, )
Deceased) )
3798 STATE RD. 61 )
PETERSBURG, IN 47567 )
)
AND )
)
MARY ANN SCHAUS )
6680 LEONHARD HILL RD., S.W. TP 191 )
PORT WASHINGTON, OH 43837 )
)
AND )
)

8

WILMA THYNE                                    )
308 W. MILL RD.                                )
EVANSVILLE, IN 47710                           )
                                               )
AND                                            )
                                               )
WILLIAM E. URBAN, II                           )
229 S. WARDELL ST.                             )
UHRICSVILLE, OH 44683                          )
                                               )
AND                                            )
                                               )
JOHN AND DORIS C. VARGO                        )
4776 LINDSEY LANE                              )
RICHMOND HEIGHTS, OH 44143-2926                )
                                               )
AND                                            )
                                               )
CHARLES R. & DIANE K. VERKAMP                  )
1714 S. CELESTINE RD., S.                      )
SCNELLVILLE, IN 47580                          )
                                               )
AND                                            )
                                               )
EUGENE J. AND CYNTHIA L. VERKAMP               )
1919 S. CELESTINE RD., S.                      )
SCHNELLVILLE, IN 47580-9704                    )
                                               )
AND                                            )
                                               )
RAYMOND A. VERKAMP (individually, and          )
As heir and executor of the estate of Leo      )
Verkamp, deceased) AND CHARLIE R.              )
VERKAMP                                        )
1820 S. CELESTINE RD.                          )
SCHNELLVILLE, IN 47580                         )
                                               )
AND                                            )
                                               )
GARY WANINGER                                  )
13288 E. COUNTY RD., 1550 N.                   )
ST. MEINRAD, IN 47577                          )
                                               )
AND                                            )
                                               )
DANIEL A. WARNER                               )

9

1394 SHARON VALLEY RD., SW )
NEW PHILADELPHIA, OH  44663 )
)
AND )
)
MICHAEL AND KATHLEEN WARGO )
(as heirs for Anna Lemmo) )
37660 MILANN DR. )
WILLOUGHBY, OH  44094 )
)
AND )
)
BOBBY WETZEL (individually and as heir to )
Dan Wetzel) )
RT. 1 BOX 91A )
LAMAR, IN  47550 )
)
AND )
)
MARIE WHEELDIN )
P.O. BOX 139 )
MT. PLEASANT, OH  43939 )
)
AND )
)
NORMA J. WIGAND )
701 CHURCH AVE. )
JASPER, IN  47546 )
)
PLAINTIFFS, )
)
-VS- )
)
HUNTINGTON NATIONAL BANK )
(itself, and as corporate successor by merger )
to FIRST NATIONAL BANK OF )
ZANESVILLE and COUNTY SAVINGS )
BANK and UNIZAN BANK) )
917 EUCLID AVENUE )
CLEVELAND, OHIO  44115 )
)
AND )
)
FIFTH THIRD BANK (itself, and as )
Corporate successor by merger to CITIZENS )
BANK and THE STRONGSVILLE )

10

SAVINGS BANK)                                    )
S/A PAUL L. REYNOLDS                             )
38 FOUNTAIN SQUARE PLAZA                         )
CINCINNATI, OHIO  45263                          )
                                                 )
AND                                              )
                                                 )
SUNTRUST BANK, N.A.                              )
c/o Csc Lawyers Incorporating Service            )
(Corporation Service Company)                    )
50 W. BROAD ST., STE. 1800                       )
COLUMBUS, OHIO  43215                            )
                                                 )
AND                                              )
                                                 )
WACHOVIA BANK, N.A.                              )
(itself, and as corporate successor by merger    )
To FIRST UNITED BANK and/or FIRST                )
UNITED BANCORP and FIRST UNION)                  )
4301 DARROW ROAD #1500                           )
STOW, OHIO  44224                                )
                                                 )
AND                                              )
                                                 )
BELMONT NATIONAL BANK                            )
152 NORTH BROADWAY                               )
NEW PHILADELPHIA, OHIO  44663                    )
                                                 )
AND                                              )
                                                 )
FIRST NATIONAL BANK                              )
112 WEST MARKET STREET                           )
ORRVILLE, OHIO  44667                            )
                                                 )
AND                                              )
                                                 )
J.P. MORGAN CHASE BANK, N.A. (as                 )
Corporate successor by merger to BANK            )
ONE)                                             )
c/o C.T. Corporation System                      )
1300 EAST 9TH ST.                            )
CLEVELAND, OHIO  44114                           )
                                                 )
AND                                              )
                                                 )
CHARTER ONE BANK                                 )

11

1215 SUPERIOR AVENUE )
CLEVELAND, OHIO  44114 )
)
AND )
)
FIRST FEDERAL COMMUNITY BANK, )
NATIONAL ASSOCIATION )
(as corporate successor by merger to the First )
Federal Savings Bank of Dover) )
321 N. WOOSTER AVE. )
DOVER, OH  44622 )
)
AND )
)
FIRSTMERIT BANK, NATIONAL )
ASSOCIATION (as corporate successor by )
Merger to Signal Bank, S.A. of Mansfield, OH) )
106 SOUTH MAIN ST. )
AKRON, OH  44308 )
)
AND )
)
KEY BANK ( itself, and as corporate )
Successor to Society Bank) )
127 PUBLIC SQUARE )
CLEVELAND, OHIO  44114 )
)
AND )
)
PNC BANK (as the corporate successor to )
National City Bank) )
249 Fifth Avenue )
1 PNC PLAZA )
PITTSBURGH, PA  15222 )
)
JOHN DOE BANKS  1-10 )
ADDITIONAL DEPOSITARY BANKS )
)
AND )
)
JOHN DOE BANKS  11-20 )
ADDITIONAL DRAWEE BANKS, )
)
DEFENDANTS. )

## OVERVIEW

1.      This lawsuit arises out of a scheme of fraud committed against the Named Plaintiffs, the class members (collectively, "the Plaintiffs") and other third-party victims not involved directly with this class-action lawsuit. The perpetrator of this fraud, James P. Carpenter III ("Carpenter") was indicted of eighteen (18) counts of fraud under 18 USC 1341 (mail fraud) and 18 USC 2 (aiding & abetting) for these acts. The indictment alleged that he conducted a fraud scheme by which he fraudulently collected approximately $21 million from over 300 victims during the period from about January, 1998 through December, 2001. Ultimately, in December of 2007, in case no. 1:05-CR-586-01, in the U.S. District Court of the Northern District of Ohio, Carpenter was convicted of all eighteen counts of the indictment and was sentenced to nine years in prison, to be followed by 3 years of supervised release and was Ordered to make $14,631,221.00 of restitution to his victims. On the belief and knowledge of the Plaintiffs, Carpenter has not made any restitution in any amount to any victim to date. Carpenter is currently imprisoned and on the belief and information of the Plaintiffs is uncollectible.

2.      The fraud scheme, grossly simplified, was that Carpenter pretended to sell investments in four (4) companies that were either non-existent or performed no substantial economic activity (other than promoting Carpenter's fraud scheme), while absconding with the money he thereby stole from his victims. This can be described as a "Ponzi" scheme. A Ponzi scheme, named for the 1930's American criminal Charles Ponzi, is a pure act of fraud (*fraud ab initio*) where the Ponzi artist pretends to sell an investment in a company. Ponzi schemes offer unnaturally high interest rates to attract investors. The money gained

13

from sales is not invested with the phony corporation, as directed by the victims. It is pooled in bank accounts set up at depositary banks. The pooled funds of the victims are used for a short time to execute the fraud. They're used to pay salespeople unnaturally high phony sales commissions (to drive further sales). The pooled funds are used to pay *the unnaturally high phony interest payments to victims for a short time (which attracts more investors)* and to redeem the investments of any victims that can't be persuaded to reinvest. When the crook decides he has enough money or needs to escape, he empties the pooled accounts of all stolen funds and transfers the money through one or more dummy bank accounts before putting it in his pocket or wiring it overseas. The transfer process is called "money laundering" and hides the theft of the pooled funds from the victims by making the money harder to trace by creating a rapid series of title changes.

3. Carpenter executed this scheme through a substantial network of dupe salespeople and several *alter ego* corporations (including one that had an actual storefront and a few employees). This fraud created three separate, but overlapping and interrelated groups of individual victims. This case is limited to civil claims for the injuries done to individuals who Carpenter defrauded by pretending to sell them investments in two non-existent companies: Lomas de la Barra Development, Inc. (hereinafter "Lomas") and Serengeti Diamonds U.S.A., Inc. (hereinafter "Serengeti"). Carpenter had represented to the plaintiffs, through a concealing layer of dupe salespeople that this was an excellent opportunity to invest in "guaranteed corporate promissory notes". Carpenter further represented that if the plaintiffs purchased a corporate promissory note from Lomas or Serengeti, they would receive a "guaranteed" rate of return of 10.9% per annum, and the note would have an attractively short maturity date (usually 9 months). He represented that payment on the note would be

14

"guaranteed" by a third-party corporate guarantor, like Lloyds' of London: the New England International Surety Corporation (hereinafter "NEISC"). Lomas was supposedly a luxury resort and condominium development in Uruguay near an exotic, exclusive beach playground of the jet set. Serengeti was supposedly a successful, well-established South African diamond jewelry designer and manufacturer seeking a distributorship in Florida. At the time Carpenter committed these acts, he was a recidivist. He was a repeat white collar criminal. He had previously been convicted of the federal crime of bank fraud and of state charges of aggravated theft, grand theft, and theft in office, as will be described below. In addition he was also a permanently disbarred attorney.

4. Carpenter and his criminal accomplices are not the Defendants in this civil lawsuit: some of the banks mentioned above are. As will be alleged below, this scheme could not have been successfully accomplished without the participation of a network of "depositary banks", through which the Plaintiffs' money was converted, stolen, "laundered" and delivered to Carpenter in a way that the act of theft was concealed from the Plaintiffs for years. Carpenter's scheme produced hundreds of checks made payable on the front, or endorsed over on the back, to two different companies that had no legal existence in Ohio: Lomas and Serengeti. 99% of these checks were made payable in amounts equal to or greater than $10,000.00. None of these checks would have benefited Carpenter any, or harmed the Plaintiffs at all, unless Carpenter could find a bank or banks willing to let him open a corporate checking account in the name of a corporation that had no legal existence or for which he could not produce proper corporate banking authorization. What Carpenter really needed was a bank or banks that would be willing to let him bank under a variety of real and phony corporate names, no questions asked. That

15

is the role each of the Defendant banks played in this case. Each defendant depositary bank allowed Carpenter to open one or more depositary bank accounts, styled as business checking accounts, for business entities that had no legal or actual existence and which Carpenter was unauthorized to bank for. The banks' actions in opening and operating these *accounts allowed Carpenter not only to negotiate his victims' checks and steal their* money, but to launder the funds into accounts titled to other corporate or individual names, also 100% controlled by Carpenter, so he could conceal his theft and fraud. The banks converted each check so negotiated. All of the depositary banks were aware of Ponzi artists, and their own duty not to let business entity checking accounts, opened through their branches, be used by tortfeasors or criminals, strangers to them, as a means through which to launder money for criminal or tortious purposes. On belief or knowledge of the Plaintiffs, all four (4) of the depositary banks that are defendants in this case had internal security measures designed to prevent such activity. On the belief or knowledge of the Plaintiffs, all of them negligently, recklessly and or knowingly violated their internal security measures while converting checks and laundering money for Carpenter. On the belief or knowledge of the Plaintiffs, these internal security measures had become the industry standard by the years 1998 and 1999, the years during which Carpenter stole the Plaintiffs' money in the Lomas and Serengeti schemes. Therefore if any of the Defendant depositary bank didn't have such internal security measures it was negligent or reckless in this regard. But for the Defendant depositary banks' negligent, reckless and or knowing participation in Carpenter's Ponzi scheme, the Plaintiffs money could not have been stolen from them nor the theft concealed from them for years.

16

5.     Carpenter's acts of deception, concealment and fraud, and litigation over which the Plaintiffs had no control, have delayed the Plaintiffs in discovering the cause of their damages, the identity of the wrongdoers that caused these damages and in bringing these claims. The Plaintiffs thought that their money had been invested in a corporation called Lomas or Serengeti in 1998 or 1999. In 1999 Carpenter, through his *alter ego* corporations and his dupe salespeople, stopped pretending to pay the Plaintiffs their interest payments, and refused to redeem their debentures when they matured. He created and maintained an elaborate pretense that first Lomas, and then Serengeti, were experiencing temporary commercial difficulties and management turmoil. Then he pretended Lomas and Serengeti's management simply could not or would not honor the debentures, without further explanation. He then organized the victims to present their claims to the corporate guarantor of the notes: the New England International Surety Corp. (a Belgian company incorporated in Panama) (hereinafter "NEISC"). Then he pretended that the NEISC refused to honor its guarantees. Carpenter maintained the pretenses that the Plaintiffs' money was lost by foreign mismanagement of actual commercial projects in Uruguay and South Africa and further by NEISC's breach of guarantees for years. Carpenter eventually hired a stooge attorney to file a sham lawsuit on behalf of the investors (naming his own wife as one of the "victims") suing NEISC for not honoring its purported guarantees of each victim's note, in 2000 in the Franklin County Court of Common Pleas in Ohio. This later became a class action against NEISC transferred to the common pleas court of Summit County, Ohio. Carpenter and the stooge attorney hired other counsel to pursue NEISC fruitlessly during 2000 and 2001. Because Carpenter was perpetrating a "copy-cat crime," other defrauded groups of Plaintiffs all over the country were now suing NEISC for similar claims for hundreds of other victims.

17

When one principal of NEISC purportedly died in U.S. Federal prison, and the other disappeared overseas and became a fugitive to the Federal courts, and NEISC became the judgment debtor to several other large, similar class actions litigated throughout the country, for tens and hundreds of millions of dollars of what were now prior judgments to this lawsuit, this other counsel abandoned the case in 2001. Still other counsel, the law firm of Keller & Kehoe (n.k.a. "Kehoe & Assoc.") (hereinafter "Kehoe") further muddied the Plaintiffs' waters. Getting itself hired by several other victims not a party to this suit, Kehoe resumed active litigation in this case. Kehoe added Carpenter, his family members, *alter ego* corporations, agents and employees as defendants to the case. Kehoe pursued these defendants, uncollectible in any significant amount of the Plaintiffs' damages, until 2009. On the belief and knowledge of the Plaintiffs, Kehoe reached a worthless consent judgment and/or settlement in this case with Carpenter and his daughter by which they promised to pay the class members in many millions of dollars. On the belief and knowledge of the Plaintiffs Kehoe has never collected a penny of this settlement and or judgment for any of the class members of that lawsuit to date. Kehoe also filed a class action lawsuit for the same class plaintiffs for legal malpractice against the other prior counsel. On the belief and knowledge of the Plaintiffs this case was halted in pre-trial litigation and with no settlement or judgment gained against the Defendants. To date Kehoe has never collected one penny on behalf of any Plaintiffs in either of these other class action lawsuits filed for similar victims in Summit County, which the Plaintiffs will call the "Posen class-action litigation" for the purposes of this Complaint. Between Carpenter's design and Kehoe's poor judgment, all the Posen litigation did was to age the Plaintiffs claims and make their ultimate litigation against the banks more difficult.

18

6.      In 2005 Kehoe filed another class action lawsuit on behalf of similar plaintiffs

to the Posen litigation in the U.S. Federal Courts of the Northern District of Ohio. This case

multiplied to four (4) related class action lawsuits in the Northern District of Ohio between

2006 and 2008, due to litigation strategy of the banks and procedural rulings of the Courts.

All of those cases were somewhat similar to this case in that they represented Carpenter's

victims as plaintiffs in civil class action lawsuits against the banks that laundered money for

Carpenter and which converted the checks of the Carpenter's victims. While this litigation

finally brought the correct claims against collectible and liable defendants (as the Plaintiffs

allege), these lawsuits have not recovered any money for any Plaintiff to date. For the

purposes of this complaint, the Plaintiffs will refer to these cases collectively as the "Metz

litigation." The statutes of limitations of the victims in this case were tolled against these

Defendants until the Metz Court denied class certification in 2009. In three of the four cases

all the Claims have been denied against all of the banks for purely procedural reasons (statute

of limitations violations). The fourth case is pending appeal in the U.S. Court of Appeals for

the Sixth Circuit. In more than one case litigation stalled while a court let a dispositive

motion pend for twelve (12) or eighteen (18) months.

7. The Plaintiffs allege that their damages occurred only when the checks stolen from

them by Carpenter and his dupe brokers were deposited into the accounts operated by

Carpenter at the depositary banks. They further allege that their statute of limitations against

the banks involved did not begin to run until they discovered both the identity of Carpenter

and that he was a Ponzi artist, and the identity of the depositary bank that converted and or

laundered their stolen check and money for Carpenter. About half of the Plaintiffs still don't

know which Defendant Bank converted and or negotiated their stolen checks. The remainder

19

of the Plaintiffs discovered the identity and nature of Carpenter and the identity of the relevant depository bank only after the filing of the Metz litigation. The Defendant banks have this knowledge and have held it in their possession this whole time, while conducting litigation strategies that delayed and multiplied the number of lawsuits filed against them. The banks have adopted this litigation strategy to age the claims against them and artificially complicate the facts and record of the case. Furthermore many, if not most, of the victims were retirees in 1998-1999. Many of the victims die or enter nursing homes each year. The banks aim to outlive the Plaintiffs with every year of litigation.

      8.    As alleged above, the funds each Plaintiff gave to a salesperson were never used to purchase any promissory notes in Lomas or Serengeti; they were just commingled in the bank accounts opened by the depository banks, controlled 100% by Carpenter. Carpenter, through his *alter ego* corporations and his salespeople, caused fraudulent documents to be issued to the plaintiffs so that they thought their purchases were successful. Neither Lomas nor Serengeti had any legal existence in Ohio. On the belief and knowledge of the Plaintiffs, an early accomplice of Carpenter's might have tried to give Lomas or Serengeti the appearance of a bare legal existence in Florida. On the belief and knowledge of the Plaintiffs in actuality neither Lomas nor Serengeti ever had any real existence or material assets in Uruguay, South Africa or anywhere. They never performed any actual or legitimate commercial or economic activity. The only economic activity they performed was involved in perpetuating Carpenter's fraud scheme. They were just names furnished to Carpenter by this accomplice, to execute and conceal these Ponzi schemes. During this time, instead, Plaintiffs' funds were all commingled in bank accounts opened, operated and/or maintained solely by Carpenter, his agents, employees, and/or family

members. Plaintiffs' funds were then used exclusively for unlawful purposes, including perpetrating the fraud, after which they were stolen and concealed.

9.      The victims did not know, nor could they have known that their funds were stolen by Carpenter due to the tortious acts of the Defendant banks, as described below. Their funds were commingled in accounts titled to Lomas, Serengeti or other fictitious or *alter ego* corporate entities. These accounts were 100% controlled by Carpenter. The dupe salespeople recruited by Carpenter to unknowingly sell these phony securities received phony, timely, accurate "commission" payments from their sales of these debentures, usually from corporate checks drawn on bank accounts titled to Lomas or Serengeti, as if Lomas or Serengeti were legitimate, adequately capitalized or profitable companies. The victims who requested full or partial redemptions, or interest payments, received phony redemptions or interest paid by corporate checks usually drawn on accounts titled to Lomas or Serengeti, as if Lomas or Serengeti were adequately capitalized or profitable companies. Other Plaintiffs received phony 1099 Interest statements corresponding to their phony interest payments. Still other Plaintiffs received clearly marked bank stamps on the back of their returned investment checks that made it appear that their checks had been deposited into a bank account titled to Lomas or Serengeti, as if Lomas or Serengeti were adequately capitalized companies conducting meaningful commercial and economic activity. These indicia of legitimate economic activity by Lomas or Serengeti, supplied by the Defendant depositary banks, were fraudulent concealment and/or constructive fraud and an indispensable part of Carpenter's fraud scheme.

10.      Huntington National Bank ("Huntington") is a depositary bank. A number of facts make Huntington's acts in this case particularly egregious to the Plaintiffs. Huntington

has assumed liability by merger with and or acquisition of three original depositary banks: "The First National Bank of Zanesville," the "Bank First National of Zanesville," and "Unizan" (hereafter collectively referred to as "FNB"). In 1998 Carpenter's daughter Ashley Carpenter (hereinafter "Ashley") took a job at a branch office of FNB that had been located in a Big Bear grocery store in suburban Columbus, Ohio. On the belief and knowledge of the Plaintiffs, Ashley had knowledge of her father's fraud scheme at that time, and helped him execute it. The Plaintiffs argue and allege that FNB is liable for Ashley's knowledge of her father's scheme and further that FNB hired, trained, employed and retained her in her duties as a teller, manager and officer at that branch office. As such, Ashley's knowledge is imputable to or deemed knowledge of FNB. Furthermore the Plaintiffs allege that her acts of fraud, ratified by FNB, became FNB's acts of fraud. Acting in the scope of her employment, in 1998 she opened up at least eight (8) business entity checking accounts that were 100% controlled by her father at that branch of FNB. At least one of these was titled to Lomas. At least one of these accounts was titled to Serengeti. Carpenter created and Ashley accepted incomplete and invalid corporate authorization resolutions for these accounts. On the belief and knowledge of the Plaintiffs, Ashley knew Lomas and Serengeti were non-existent corporations that Carpenter was not authorized to bank for. During 1998 and through February 1999 Carpenter deposited between one hundred and one hundred and fifty checks made out to Lomas and Serengeti into these accounts. The collective face value of these checks totaled substantially more than four million dollars ($4,000,000.00). In January of 1999 FNB somehow discovered that it had wrongfully opened these accounts for Carpenter. On the belief and knowledge of the Plaintiffs FNB launched an internal investigation of Ashley, Carpenter and Carpenter's accounts at FNB. During January or

February of 1999 FNB put an administrative hold on all of Carpenter's FNB accounts. On the belief and knowledge of the Plaintiffs, there was substantially more than $1,000,000.00 of stolen money in those accounts, collectively, at this time. As a result of this investigation, FNB became aware both of Carpenter's record of attorney discipline by the Ohio Supreme Court and of his criminal record in the federal and state courts of Ohio. On the belief and knowledge of the Plaintiffs FNB personnel other than Ashley examined the records and documents of Carpenter's FNB accounts, including their corporate authorization resolutions. Nevertheless after this investigation, in February of 1999, FNB lifted the administrative hold on Carpenter's FNB accounts and allowed him to withdraw the remaining stolen money. Ashley subsequently left FNB and went to work at her father's *alter ego* companies, where she continued to participate in and benefit from her father's fraud schemes. The Plaintiffs argue that FNB officers other than Ashley knew, or should have known, by reviewing the corporate authorizations Carpenter had filled out for FNB, and by doing their due diligence on them in accordance with their "know thy customer" internal security regulations, that Carpenter was not authorized to bank for Serengeti and Lomas and there were no such companies. Plaintiffs argue that at this point, in February of 1999, FNB had actual and legally implied knowledge that it has just converted and laundered several million dollars for a convicted bank fraudster. Plaintiffs argue that as a result of this knowledge FNB was obligated to make several disclosures to different individuals. They should have notified the FBI of the specifics of Carpenter's activity at their bank. They should have contacted every maker of every check converted and laundered through their accounts as well as every drawee bank for these checks, and stated to them that Carpenter had negotiated these checks though their bank without proper corporate authorization, over apparently forged, missing or

otherwise unauthorized endorsements. FNB's disclosures to these check makers and drawee banks should also have included an accurate description of Carpenter's attorney disciplinary record and criminal records. Plaintiffs allege that FNB violated its duty to make these disclosures to avoid the mere possibility of facing civil liability for its acts, without regard to the horribly foreseeable damage its active participation in Carpenter's fraud scheme had done and could do to Carpenter's past or future victims. On the belief and knowledge of the Plaintiffs, Huntington is liable for these acts by FNB.

11.     The acts described in the indictment and judgment against Carpenter, described above, in concert and in combinations with the torts alleged against the Defendants below, caused all of the Plaintiffs' losses. All of the Plaintiffs, a class of individuals believed to number in excess of two hundred fifty (250) individuals, were amongst Carpenters' victims as described in the indictment referred to, above. They have been defrauded of some or most of their lifetime retirement savings. No Plaintiff was defrauded of less than $10,000.00. Some lost in excess of $100,000.00. Several lost in excess of $300,000.00. One couple lost more than $500,000.00.

12.     The depositary banks benefited directly, and indirectly, from having Carpenter's stolen money on deposit with their bank. The direct benefits included fees charged to and earned from these accounts. Since the time that the depositary banks and the proximate liability bank have learned that they earned direct benefits from a criminal's deposit with them of money stolen from the Plaintiffs and other victims, they have made no attempt to disgorge themselves of these profits to the Plaintiffs or these other victims.

## PARTIES

24

13.     Named Plaintiffs Jerome and Frances Pate were citizens of Ohio and residents of Summit

County at all times relevant to the facts alleged in this complaint.  They were injured when

Carpenter's co-conspirators, agents and or employees presented one or more checks that the

Pates had legal and/or equitable ownership and/or title and/or  property interests in to the

Defendant depositary bank, First National Bank of Zanesville (n.k.a. Unizan Bank) (n.k.a.

Huntington Bank), which converted and wrongfully negotiated these checks into one or more of

the business entity checking accounts it opened in the name of Lomas and Serengeti.  That is

because the accounts were in the name of Lomas and Serengeti, but they were 100% controlled

by and in the title of Carpenter.

14.     Named Plaintiff Gail Lythos was a citizen and resident of Ohio at all times relevant to the

facts discussed in this Complaint.  She was injured when Carpenter's co-conspirators, agents and

or employees presented one or more checks that Lythos had legal and/or equitable title and/or

ownership and/or property interests in to the Defendant depositary bank, Fifth Third Bank.  Fifth

Third converted these checks when it wrongfully negotiated each check into one or more

accounts it opened in the name of  Lomas and Serengeti.  That is because the accounts were in

the name of Lomas and Serengeti, but they were 100% controlled by and in the title of

Carpenter.

15.     Named Plaintiff David C. Miller was a citizen of Ohio at all times relevant to the facts

alleged in this complaint.  Miller was injured when Carpenter's co-conspirators, agents and or

employees presented one or more checks that Miller had legal and/or equitable title and/or

ownership and/or property interests in to the Defendant depositary bank SunTrust Bank.

SunTrust converted these checks when it wrongfully negotiated these checks into an account it

opened in the name of Serengeti. That is because the account was in the name of Serengeti, but it was 100% controlled by and in the title of Carpenter.

16.     Named Plaintiff Rita Brodnik was a citizen of Ohio at all times relevant to the facts alleged in this complaint. Brodnik was injured when Carpenter's co-conspirators, agents and or employees presented one or more checks that Brodnik had legal and/or equitable title and/or ownership and/or property interests in to Defendant depositary bank Wachovia (n.k.a. Huntington National Bank) into one or more of the accounts it opened in the name of Lomas and or Serengeti. That is because the account was in the name of Serengeti, but it was 100% controlled by and in the title of Carpenter.

17.     The named Plaintiffs Claude & Doneva Cole, Wilhana Cox, Frances Devore, Ron Fisher, Dorothy Freschly, STK LTD., Margaret Loyd, Robert J. Lueken, Rosemary Mayhorn, Patrick & Kim McCafferty, Frances Merkel, Virginia Snider, Wilma Thyne, Charles & Diane Verkamp. Eugene & Cynthia Verkamp, Raymond & Charlie R. Verkamp, Gary Waninger and Norma Wigand were citizens of Indiana, Kentucky, Kansas and Pennsylvania at all times relevant to the facts of this complaint. They were each one injured when the depositary banks, described above, aided and abetted Carpenter in his fraud scheme wrongfully negotiating each of the checks he or his dupe salesmen and agents had stolen from these victims, and then further by committing some or all of the acts of money laundering described above.

18.     The Defendant banks Belmont National Bank ("Belmont"), J.P. Morgan Chase Bank, N.A. ("Chase Bank"), Charter One Bank, Fifth Third Bank, First National Bank (Orrville, OH) ("First National"), First Federal Community Bank, National Association ("First

Federal Community"), Firstmerit Bank, National Association ("Firstmerit"), Huntington

National Bank ("HNB"), KeyBank, N.A. ("KeyBank") and PNC Bank are the "drawee" banks. A drawee bank is a bank at which one of the Plaintiffs had their own checking account: the checking account on which a check was drawn that Carpenter stole and converted. As will be alleged in detail below, each time Carpenter got a depository bank to convert and or wrongfully negotiate one of these checks, the drawee bank for that check, upon transfer and presentment of the converted check by the depository bank, would wrongfully pay the depository bank the value of that check, without authorization and it would then wrongfully debit the checking account of the Plaintiff that had written that check the amount the check was made out for. The Drawee banks have a statutory duty under the Ohio Codification of the UCC to refund the Plaintiffs the face values of these converted checks, now that they have been informed and it is *res judicata* that all of these checks were paid over forged or unauthorized endorsements and to parties unauthorized to receive such payments, through a scheme of conversion and theft. Some of these Defendant Drawee banks have wrongfully refused, some for years, to perform this statutory duty.

19. The named Plaintiffs Gene L. Aungst, John S. Dauer, George & Martha Glauber, Nan Golden, The Deardorff Trust, Eldiva P. Hawkins, Dennis & Robyn Horgan, the Sewing Boutique, Samuel Keffer, Annemarie Konte, Charles Leonhard, Pauline Lierseman, David & Renee Miller, Lawrence McCauliffe, Ted Polka, Joseph Radvansky, Elnora Reaves, R. Scott & Dina G. Schuss, St. Peters Lutheran Church, Eleanor Pawlak, and Marie Wheeldin were at all times relevant to this complaint citizens of the state of Ohio. They were each one of them injured when one or more checks was stolen from them by Carpenter and his accomplices, then wrongfully negotiated by one of the Defendant Depositary banks, which then transferred and/or presented to the same check to the Defendant drawee bank at which they were a customer; and

which Defendant Drawee bank then wrongfully debited their bank account in the amount of the stolen check. These injuries occurred when each of these named Plaintiffs had their bank accounts wrongfully debited by the Defendant drawee bank at which they were a customer (in the amount of the stolen instrument).

20.     All of the named Plaintiffs believed they were paying the purchase price of an investment in Lomas De La Barra and/or Serengeti Diamonds, in the form of guaranteed corporate promissory note, when they delivered their checks to one of Carpenter's employees, agents or co-conspirators.

21.     Defendant Huntington National Bank (hereinafter Huntington) is the corporate successor by mergers with the First National Bank of Zanesville and with Bank First National Bank of Zanesville, Its is an FDIC insured bank that conducts business in Ohio on a regular basis and maintains multiple branch offices in Ohio, including branches in Summit County. Huntington opened and operated the greatest number of phony business checking accounts for Carpenter, Lomas and Serengeti (roughly eight) and converted the most checks of the Defendants Therefore Huntington is liable to many Plaintiffs. Huntington is also a drawee bank to several named Plaintiffs.

22.     Defendant Fifth Third Bank (hereinafter "Fifth Third") is an FDIC insured bank that conducts business in Ohio on a regular basis. It is headquartered and incorporated in Ohio. It maintains multiple branches in Summit County. A significant number of the checks Carpenter stole from the Plaintiffs were wrongfully negotiated and laundered through this bank and converted by this bank. Fifth Third therefore is liable to many Plaintiffs. Fifth Third only apparently opened and operated one (1) Lomas account to launder money for Carpenter. It appears that after receiving a subpoena for the records of this account they were "purged.".

Plaintiffs still have some records of checks converted by Fifth Third in this account. Fifth Third's apparent destruction of its own records should not prevent it from being held accountable for checks it converted through this account. Fifth Third is also a drawee bank to several Plaintiffs.

23.     Defendant SunTrust Bank, N.A. (hereinafter SunTrust) is an FDIC insured bank that conducts business in Ohio on a regular basis and maintains multiple branch offices in Ohio. It is headquartered and incorporated in another state. SunTrust opened and operated three (3) Lomas and Serengeti accounts for Carpenter. A significant number of the checks Carpenter stole from the Plaintiffs were wrongfully negotiated, and laundered through this bank and converted by this bank. Therefore SunTrust is liable to many Plaintiffs.

24.     Defendant Wachovia Bank, N.A. (hereinafter Wachovia) is the corporate successor bank to First United Bank and/or First United Bancorp and First Union Bank. It is an FDIC insured Bank that conducts business in Ohio on a regular basis and maintains multiple branch office in Ohio. It is headquartered and incorporated in another state. A significant number of the checks Carpenter stole from Plaintiffs were wrongfully negotiated and laundered through this bank and converted by it. Wachovia ultimately opened and operated three (3) Lomas and Serengeti accounts for Carpenter. Therefore Wachovia is liable to many Plaintiffs.

25.     Huntington, Fifth Third, SunTrust and Wachovia are collectively referred to as "the depository banks".

26.     Bellmont National Bank, Chase Bank, Charter One, Fifth Third, First National, First Federal Community, KeyBank, PNC and Firstmerit are all banks that are either:  corporations resident in Ohio; doing business in Ohio; having branches located in Ohio; licensed to do

business and bank in Ohio, having a corporate agent for service in Ohio; and/or otherwise amenable to civil lawsuit in Ohio by the laws of Ohio.

## JURISDICTION AND CLASS ACTION PREREQUISITES

27.     The named Plaintiffs and the Depositary banks are all residents of Ohio and/or do business in Ohio. All of the acts of conversion alleged against the Defendant banks Huntington and Fifth Third occurred at their branches in Ohio. The acts of conversion alleged against the Defendant banks Wachovia and SunTrust occurred at branches located in Florida, but most of the victims were from Ohio. The Ohio victims all surrendered their checks to Carpenter's co-conspirators, co-defendants, employees and agents in Ohio.

28.     Pursuant to the Ohio Civ.R. 23, the Plaintiffs bring this action on behalf of themselves and all other members of a class defined as

> All individuals who, during the time period between and including 1997 and 1999 purchased promissory notes in either Lomas De La Barra Development, Corporation, Inc. and or Serengeti Diamonds U.S.A., Inc., and who were then injured when their checks were converted by the Defendant banks Huntington, Fifth Third, Wachovia and SunTrust and improperly and wrongfully deposited into bank accounts opened, operated and/or maintained by these defendant depositary banks, 100% controlled by Carpenter, his agents, employees and or *alter ego* corporations.

29.     The class is so numerous that joinder of all members of the class is impracticable. The class may consist of over two hundred and fifty members.

30.     Plaintiffs also designate the following sub-classes:

## CLASSES

31.     THE PATE CLASS: All individuals who, during the period between and including 1998 and 1999 purchased promissory notes in either Serengeti Diamonds U.S.A., Inc. (Serengeti) and/or Lomas De La Barra Development Corporation, Inc. (Lomas) and who were injured when

their checks were deposited into a Huntington Lomas or Serengeti business checking account and converted by defendant Huntington Bank.

31.    THE LYTHOS CLASS: All individuals who, during the period between and including 1998 and 1999 purchased promissory notes in either Serengeti Diamonds U.S.A. (Serengeti) and/or Lomas De La Barra Development Corporation , Inc. (Lomas) and who were injured when their checks were deposited into a Fifth Third Lomas or Serengeti business checking account and improperly converted by defendant Fifth Third Bank.

33.    THE MILLER CLASS:  All individuals who, during the period between and including 1998 and 1999 purchased promissory notes in either Serengeti Diamonds U.S.A., Inc. (Serengeti) and/or Lomas De La Barra Development Corporation, Inc. (Lomas) and who were injured when their checks were deposited into a SunTrust Serengeti business checking account and  improperly converted by defendant SunTrust Bank.

34.    THE BRODNIK CLASS: All individuals who, during the period between and including 1998 and 1999 purchased promissory notes in either Serengeti Diamonds U.S.A., Inc. (Serengeti) and/or Lomas De La Barra Development Corporation, Inc. (Lomas) and who were injured when their checks when their checks were deposited into a Wachovia Lomas or Serengeti business checking account and  improperly converted by defendant Wachovia Bank.

Common Questions of Law and Fact

35.    There are questions of law and fact that are common to the class, including but not limited to the following:

(a)    Whether the Defendant depositary banks negligently opened or maintained any bank accounts for Carpenter and his co-conspirators;

31

     (b)     Whether the depositary banks fraudulently opened or maintained any banks for Carpenter and his co-conspirators;

     (c)     Whether the Defendant depositary banks converted the Plaintiffs' funds;

     (d)     Whether the transfer of funds out of the Defendant depositary bank accounts, with knowledge of Carpenter's fraud, constituted a wrongful taking of personal property;

     (e) Whether the Defendant depositary banks aided and abetted Carpenter's fraud ad conversion; and

     (f) Whether the Defendant drawee banks paid items that were not properly payable when the Plaintiffs had their accounts debited.

36.     The named Plaintiffs will fairly and adequately protect the interests of the class members. The name Plaintiffs' interests are not antagonistic to the interests of the other class members.

37.     The questions of law and fact that are common to members of the class predominate over any questions affecting only individual members. The primary questions pertinent to the issue of liability, as to all class members, are whether their checks were properly payable or whether they were taken unlawfully when deposited into the accounts of the Defendant depositary banks. The determination centers on the behavior of the individual depositary banks and will be resolved consistently with respect to each member whose funds were deposited in that individual bank. These questions common to all the Class as a whole predominate over any questions affecting only individual members of the Class.

38.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Adjudication of class members' individual claims would otherwise require hundreds of individual suits with concomitant duplication of costs,

attorneys' fees and demands upon court resources. If the individual class members were required to pursue their claims through separate, individual suits, the potential for recovery would be outweighed by the high cost of investigation, discovery and expert testimony related to the liability of the Defendants.

39..    Before opening the accounts needed to defraud the Plaintiffs, the public record revealed that Carpenter was permanently disbarred from the practice of law in Ohio for misappropriating client funds, convicted of felony bank fraud, and had been incarcerated in both Federal and Ohio prisons.

FACTS COMMON TO ALL CLASSES

40.    In or about 1993, the Supreme Court of Ohio permanently disbarred Carpenter from the practice of law in Ohio. Among other things, the Court found that Carpenter had misappropriated approximately two hundred forty thousand dollars ($240,000) of his clients' funds. The decision was a matter of public record as set forth in *Office of Disciplinary Counsel v. Carpenter* (1993). 68 Ohio St. 3d 99.

41.    In or about 1991, Carpenter plead guilty to the felony of Bank Fraud, in violation of 18 U.S.C. 1344, in the United States District Court, Southern District of Ohio, Eastern Division, *United States v Carpenter*, Criminal Case #2-91-006. His sentence included incarceration in a Federal penitentiary for two years. The Court also issued an Order of Restitution requiring Carpenter to repay more than one hundred and sixty-eight thousand dollars ($168,000.00) to various banks and/or insurance companies. Carpenter violated the restitution portion of his sentencing, which upon information and belief, the Federal prosecutor's office reported to the consumer credit reporting agencies prior to 1998.

42.    In or about 1991, Carpenter plead guilty to the felonies of Aggravated Theft, Grand Theft and Theft in Office in a separate State of Ohio case captioned *Ohio v. Carpenter*, Licking Cty. Ohio Case Nos. 90-L-17840 and 91-18095. Carpenter was sentenced to incarceration in a State correctional facility for two years.

43.    Carpenter's disbarment from the practice of law and criminal record, at all material times herein, were matters of public record.

44.    Between 1998 and 2000, Carpenter conspired to create a ponzi-scheme fraud using phony corporate promissory notes offered by his fictitious, *alter ego* entities Lomas and Serengeti.

45.    Lomas and Serengeti were never registered with the Ohio Secretary of State as domestic corporations. Lomas and Serengeti never performed any substantial economic activity other than promoting Carpenter's fraud. Their promissory notes were never intended to be anything other than Carpenter's criminal tools.

46.    Carpenter and the depositary banks caused it to appear that Lomas and Serengeti issued corporate promissory notes as an investment.

47.    The execution of this scheme included the recruiting of a sizeable network of insurance salesmen and brokers who made virtually all of the sales of the fraudulent notes to the plaintiffs.

48.    In order to conceal the fraud and conversion, Carpenter instructed his salesmen and brokers to direct the investors to either make their checks payable to Lomas and or Serengeti on the front of the check, or, in the case of checks made payable to the victims on the front of the check, to have the victims endorse them over to International on the backs

34

of the checks. Carpenter could only benefit from such activity if he had bank accounts titled to International that he had 100% control over.

49. More than one hundred (200) victims have collectively lost more than fifteen million dollars ($15,000,000.00) in the Lomas and Serengeti frauds.

50. Carpenter eventually gained sole control of the funds converted from the Plaintiffs.

51. Carpenter began utilizing bank accounts wrongfully opened and maintained in the names of various corporations, starting in January of 1998, in order to conceal his conversion of Plaintiffs' funds and his ill-gotten gain and his crimes and torts from prior Ponzi schemes.

52. Prior to 1999 Carpenter had at least one alter ego corporation he was using to perpetrate previous frauds: The Vantage Capital Group, Inc.

53. In 1999, Carpenter formed several other alter ego business entities including, but not limited to: Dennison Funds LTD, Stanford Capital Group LTD, Vision Capital Group LTD, and International Real Estate Investment Group, LTD. (hereinafter the "Carpenter corporations").

54. Between 1997 and 1999, Carpenter registered each of the Carpenter corporations with the Ohio Secretary of State. Accordingly, the fact that he was the principal and owner of each company was a matter of public record, easily verifiable by the Defendant Banks.

Facts Common To The <b>Pate</b> Sub-Class

55. Ashley was employed as a teller and officer during 1997 and 1998 by FNB in a branch office located in a grocery store.

56. On September 15, 1998, Ashley opened the FNB depositary accounts numbered 30179955 and 3017994 (hereinafter "FNB accounts") for her father.

57.     These accounts were opened in the names of Lomas de la Barra Development Corporation and Serengeti Diamonds, U.S.A., Inc.

58.     The corporate authorization resolutions for these accounts were transparently invalid.

59.     The address listed on the authorization forms for the corporations, 947 E. Johnstown Rd., Ste. 244, was not a corporate office of either Lomas or Serengeti.

60.     The corporations were not registered with the Ohio Secretary of state as an Ohio Corporation, during 1998 (or ever), contrary to what was indicated on the corporate authorization forms.

61.     James Carpenter  was not an officer of either Lomas or Serengeti, contrary to what as was indicated on the authorization forms.

62.     The corporate authorization forms of these accounts lacked both notary and corporate seals.

63.     Carpenter referred to himself as the Secretary of both Lomas and Serengeti on the authorization forms.

64.     Carpenter listed himself as another attesting officer on these same corporate authorization forms.

65.     These authorization forms gave exhaustive and exclusive control to Carpenter for both of the FNB accounts.

66.     The opening of the FNB accounts in this manner violated several of FNB's own internal security policies.

67.     In January of 1999 FNB discovered Carpenter's attorney disciplinary record and criminal record and that Lomas and Serengeti did not appear to be Ohio corporations.  FNB wrote Carpenter demanding that he come and shut all of his accounts and stated that FNB had

36

discovered facts that would have prevented them from opening any accounts for him in 1998. FNB subsequently put an administrative hold on all of his FNB accounts, freezing them while there was still over $1,000,000.00 of stolen money in them, clearly belonging to a number of individuals whose identity could be easily determined. FNB apparently launched an investigation of Carpenter, Ashley and the bank accounts.

68.     On or about February 5, 1999, FNB's General Counsel, Janine M, Marks discovered the problems associated with the opening of the FNB accounts and Carpenter's control over the same. On the belief and knowledge of the Plaintiffs, discussions of this situation and what to do about it occurred beyond the branch office of FNB where the accounts were opened, presumably at the corporate headquarters of FNB, between FNB's general counsel, corporate security officer, and other senior officers and or executives of FNB.

69.     During this time period Carpenter retained the services of a Columbus attorney and boldly demanded, through counsel, the immediate release of the more than $1,000,000.00 of his victims' stolen money that FNB was retaining. At this time FNB knew, as a matter of state and federal law and regulation, and in accordance with its own internal security policies, that every penny of that money had been delivered into the legal possession, ownership and control of Mr. Carpenter without the authorization of the makers of those checks.

70.     On the knowledge and belief of the Plaintiffs, FNB did not at this point (or at any point subsequent) contact the FBI or any law enforcement authorities about this stolen money.

71.     On the knowledge and belief of the Plaintiffs, FNB did not at this point (or at any point subsequent) attempt to involve the Courts of Ohio in this dispute; it did not try to deposit the money with the Courts by interpleader.

72.    On the knowledge and belief of the Plaintiffs, FNB did not at this point (or at any point subsequent) attempt to contact the makers of the checks laundered through its accounts or the drawee banks to these checks and inform them of this situation.

73.    For reasons unknown, perhaps to wrongfully avoid civil liability, perhaps to avoid negative publicity, or perhaps even to create or protect a reputation as a "no questions asked" bank, FNB released the funds held in its accounts to Carpenter in or about February of 1999.

Facts Common To The **Lythos** Sub-Class

74.    In 1999, Carpenter and his daughter opened a series of corporate depositary accounts with Defendant Fifth Third.

75.    One of these accounts, numbered 753-4093, was opened in the name of Lomas. Fifth Third subsequently purportedly "lost" the account opening documentation of this account. Other records for this account have been "purged" from its records before or during 2004 by Fifth Third. This destruction of business records required to be kept in banking was an attempt to help Carpenter conceal his fraud from his victims, as well as Fifth Third's role in it.

76.    The account opening documents kept by Fifth Third for Carpenter's other accounts opened for him in 1999, as produced for other litigation, did not include corporate authorization forms. The Plaintiffs allege that Fifth Third examined these in 2004 and realized they contained evidence of Carpenter's fraud and their complicity in it; that they spoliated and destroyed these records, in their pattern of fraudulent concealment. They allege in the alternative that Fifth Third did not request these documents of Carpenter or his agents, possibly at Carpenter's request, as part of their pattern of negligent, reckless or knowing participation in his fraudulent or tortuous activity.

38

77.     The corporate signature cards for Carpenter's other accounts, which have been produced by Fifth Third, are facially invalid. Some fail to identify the individual opening the account. Some fail to list the telephone number, date of birth, or even the signature of the individual attesting to the veracity of the information solicited by the signature card.

78.     On the knowledge and belief of the Plaintiffs, Fifth Third had internal security procedures and policies for the opening of corporate checking accounts to strangers that all of these acts substantially violated. Had Fifth Third performed its security procedures with due diligence, it would have discovered Carpenter's identity and lack of fitness to bank for Lomas, and any other entity, closed these accounts, and refused further to bank for Carpenter, his agents or his shell and *alter ego* corporations, as did FNB did, even belatedly, in January and February of 1999.

79.     Fifth Third had the last clear chance to avoid the loss for Carpenter's scheme of check fraud, as between Fifth Third and the **Lythos** sub-classes. Carpenter subsequently opened account#75455704 at Fifth Third several months later. He opened this in the name of Rawhide Select, Inc. Although the corporate authorization resolution described Rawhide as an Ohio corporation, it was never an Ohio corporation and it was not registered with the Secretary of State of Ohio as an Ohio corporation in 1999. On the belief and knowledge of the Plaintiffs Rawhide had some legal existence in New York, at some point in time, but a search of the records of the Secretary of State of New York would have shown that Rawhide was either not a corporation in New York in 1999, or not a corporation that had filed the proper registration documentation with the Secretary of State of New York in several years.

80.     Fifth Third's opening of a second corporate checking account, for a second non-existent corporation, for the same stranger, in a relatively short period, without scrutinizing that

stranger's authorization to bank, identity or credentials, establishes a pattern of fraud, conspiracy to commit fraud, aiding and abetting fraud and or bad faith in its banking practice and procedures. In the alternative, Plaintiff's allege that it is an element of Fifth Third's negligent or reckless participation in Carpenter's scheme. Having failed to refuse to let Carpenter bank for Lomas early in 1999, a non-existent corporation he was not authorized to bank for; Fifth Third now had a second, distinct opportunity to refuse to let Carpenter bank for a non-existent corporation he was not authorized bank for, several months later in 1999. Instead Fifth Third inexplicably let Carpenter bank for Rawhide. Fifth Third thus recklessly and or knowingly became Carpenter's partner in bank fraud in his Ponzi schemes.

81.    Still later in 1999 Fifth Third opened up three (3) more corporate checking accounts for Carpenter. On the belief and knowledge of the Plaintiffs, there were multiple substantial irregularities with the corporate authorization resolutions and or the corporate signature cards with these accounts such that Fifth Third violated its own internal security policies when it opened these accounts. Two of these, accounts #75341475 and #999199091 were opened in the name of "International Real Estate Investment Group, Ltd." On the belief and knowledge of the Plaintiffs the third, account #75516124, was titled to "Canadian Resorts Investor Escrow." As the Plaintiffs do not currently have access to these records, they will not be able to plead Fifth Third's liability on these matters with further specificity until after the discovery phase. These acts show Fifth Third's continuing pattern of negligent and or reckless participation in Carpenter's fraud scheme.

82.    Banks are supposed to treat checks made out in amounts equal to or greater than $10,000.00 with special care. Banks are never supposed to deposit a check made out to the name of one corporation into an account bearing a different corporate name or into an

individual's account. All of the checks Fifth Third deposited into account #75516124 were in the amount of $10,000.00 or greater. All of them were made payable to "International Real Estate Investment Group, Ltd." It is not clear that "Canadian Resorts Investor Escrow" is either the proper name for a corporation or an individual. On the belief and knowledge of the Plaintiffs Fifth Third had internal rules for the opening of escrow accounts, and they were not applied to account #75516124. The naming Fifth Third gave to account #75516124 was a substantial corporate banking irregularity itself. Therefore each time Fifth Third negotiated a check made out to International into this account it violated various policies, standards, customs, regulations and laws.

83.     This Complaint only deals with the claims and damages of the **Lythos** sub-class, whose checks were stolen and laundered through the Fifth Third Lomas account. The claims and damages of the Carpenter victims whose stolen checks were laundered through the Fifth Third Rawhide and International accounts are the subject of other, related lawsuits. Fifth Third's conduct concerning those accounts is relevant to this lawsuit because it demonstrates the mental element, assistance and role Fifth Third had with regards to Carpenter's fraud schemes. They are also inseparable in time and place from the events of Fifth Third's participation in the Lomas scheme.

Facts Common To The <b>Miller</b> sub-Class

84.     On or before February 2, 1999, Defendant Sun Trust Bank opened the corporate checking account #798007295699 in the name of Serengeti Diamonds U.S.A., Inc.

85.     The only account opening documentation for the Sun Trust account is a single signature card allegedly signed by Kenneth Roberts, the purported principal of Serengeti. The signature card fails to list the "identification" that "Dr. Roberts" showed Sun Trust personnel when the

41

filled out signature card was tendered to them (as proof of his identity and presence at Sun Trust).

86.     On the belief and knowledge of the Plaintiffs, "Dr." Kenneth Roberts is a citizen of South Africa, a real person, a resident of South Africa, currently in South Africa, and was an accomplice in at least one other corporate promissory note scam executed or started in Florida.

87.     On the belief and knowledge of the Plaintiffs, Kenneth Roberts was not in the United States when the Sun Trust account was opened. Carpenter or an agent opened it. It is *res judicata* that all the deposits into this account were unauthorized and went into the control, possession and personal use of Carpenter.

88.     On the belief and knowledge of the Plaintiffs, the Sun Trust account was opened and controlled by Carpenter and his Miami agents. On the belief and knowledge of the Plaintiffs Carpenter had a stooge law or accounting firm in Miami handle the SunTrust deposits for him (as each check to be deposited was made payable in an amount at least $10,000.00).

89.     Sun Trust has spoliated or concealed documents showing that it opened a corporate checking account for a non-existent corporation without a facially valid corporate banking authorization resolution and a properly filled out corporate signature card (one showing that the "owner" of the account, the authorized corporate representative, and the identification papers he produced to be allowed to sign a corporate signature card), in violation of its own internal security measures).

90.     In the alternative Plaintiffs plead that Sun Trust did not have internal security measures in keeping with the industry standards for screening strangers seeking to open business entity checking accounts with Sun Trust. It opened, maintained and operated this account in a negligent and reckless manner. Sun Trust banking practices and procedures in this matter

constitutes a pattern of fraud, conspiracy to commit fraud, aiding or abetting fraud and or bad faith.  It was willing to open a business account in the name of a non-existent corporation for an individual who was a stranger to it, from whom it apparently did not ask for corporate authorization to bank or valid personal identification.  Plaintiffs allege in the alternative, that Sun Trust had the last clear chance to avoid the loss to the **Miller** subclass.  As the Plaintiffs do not currently have access to the records of the Sun Trust account, they will not be able to plead Sun Trust's liability on these matters with further specificity until after the discovery phase.

Facts Common To The <strong>Brodnik</strong> Class

91.     On or about November of 1997, First United Bank of Boca Raton (n.k.a. Wachovia) (hereinafter "First United") opened corporate checking account #1083271 and titled it to "Fimpaco, Inc."  On the belief and knowledge of the Plaintiffs, Carpenter's original Florida accomplice had either just finished a Ponzi scheme or was planning a future Ponzi scheme in name of a fictitious company Fimpaco, Inc.  He may have had an assetless Florida corporation named Fimpaco, Inc. registered with the Florida Secretary of State.  He apparently had opened this corporate bank account and titled it to that name.

92.     In January of 1998 this accomplice had First United change the name of the account by issuing a new corporate signature card in the name of Lomas.  This card was purportedly signed by Paolo Cornacchia, "President."  There is no other identification on the card.  On the belief and knowledge of the Plaintiffs there is no corporate banking authorization resolution for this account or name change.  On the belief and knowledge of the Plaintiffs the accomplice may have tried or managed to change the name of Fimpaco, Inc. to Lomas, as it is registered with the Florida Secretary of State, just prior to these events.  A Boca Raton, Fla. address was

43

listed for this account, which conformed to the original Florida accomplice's business address. No other information was provided by Cornacchia or Lomas on this card. On the belief and knowledge of the Plaintiffs Paolo Cornacchia is a real person and a citizen of Italy. He was also the "star" of another Ponzi scheme, in yet another corporate name that the original Florida accomplice had apparently organized (for which Carpenter had apparently sold notes, but had not been the Ponzi artist). It is *res judicata* that the checks stolen, negotiated and laundered through this account were not paid to Lomas as authorized.

93.     In early 1998, about the same time the First United Lomas account was opened, the same Carpenter accomplice opened a Serengeti account at First United. On the belief and knowledge of the Plaintiffs, First United did not produce a facially valid corporate banking authorization resolution or a properly filled out corporate signature card for this account either. Since the Plaintiffs no longer have access to these records, they will not be able to plead this matter with further specificity until during the discovery phase.

94.     On or about February of 1999, Defendant Wachovia (then known as Wachovia) opened a corporate checking account, #19-855-422, in a Florida branch of Wachovia, in the name of Lomas.

95.     Wachovia has produced only a corporate signature and or ownership card for this account as account opening documentation. The card is not completely filled out. The address given for Lomas is no longer Boca Raton, but Rincon 468 PISO 5, Escrito 56-100, Montevideo, Uruguay. There is a signature on the card, illegible, on the belief and knowledge of the Plaintiffs it is supposed to be Paolo Cornacchia'a. It looks nothing like the First United Signature card signature of Cornacchia. No identification is listed as being received along with the card to validate the identity of the account opener and card signer. On the belief and

44

knowledge of the Plaintiffs, Carpenter himself traveled to Florida to open this account as he had cut out his original Florida accomplice during the second half of 1998, (one Eugene Barnett of Boca Raton, who probably taught Carpenter how to be a Ponzi artist).

96.     Wachovia  has spoliated or concealed documents showing that First United and it opened corporate checking accounts for a non-existent corporation without a facially valid corporate banking authorization resolution and a properly filled out corporate signature card (one showing that the "owner" of the account, the authorized corporate representative, and the identification he produced to be allowed to sign a corporate signature card), in violation of its own internal security measures.

97.     In the alternative Plaintiffs plead that Wachovia did not have internal security measures in keeping with the industry standards for screening strangers seeking to open business entity checking accounts with it.  It opened, maintained and operated these accounts in a negligent and or reckless manner.  Wachovia's banking practices and procedures in this matter constitute a pattern of fraud, conspiracy to commit fraud, aiding or abetting fraud and or bad faith.  First United and Wachovia were willing to open a business account in the name of a non-existent corporation for an individual who was a stranger to it, from whom it apparently did not ask for either corporate authorization to bank or valid personal identification.  Plaintiffs allege in the alternative, that First United and Wachovia had the last clear chance to avoid the loss to the **Brodnik** sub-class.  As the Plaintiffs do not currently have access to the records of these First United and Wachovia accounts, they will not be able to plead Wachovia's  liability on these matters with further specificity until after the discovery phase.

### COUNT I VIOLATION OF R.C. 1303.60 : CONVERSION OF AN INSTRUMENT

98.     Plaintiffs incorporate the allegations in paragraphs 1 through 97 as if fully rewritten herein.

99.    All of the named plaintiffs had ownership and the right to possession of the checks that were stolen from them by Carpenter and converted by the defendant banks, at the time of conversion. Their rights to the funds represented by the checks stolen from them were always legal and resulting from contract. Every named plaintiff had at least an equitable title to ownership or possession over the funds represented by the checks that were stolen from them by Carpenter and converted by the defendant depositary banks, at the time of conversion.

100.    The conversion of all of the named Plaintiffs' checks by the defendant depositary banks was by a series of wrongful acts that culminated in an ultimately wrongful disposition of the named Plaintiffs' property rights. It is *res judicata* by the criminal action described above that the ultimate delivery of the named Plaintiffs' money to Carpenter resulted in the crimes of mail fraud and aiding and abetting. This is because Carpenter was never authorized to bank for or receive funds in the name of these non-existent corporations that were the mere tools of a Ponzi scheme: Lomas and or Serengeti.. The defendant banks had a duty to discover that Carpenter was a permanently disbarred, ex-con with a record for bank fraud trying to open up checking accounts for non-existent corporations with phony tax EIN numbers. Had any of the defendant banks followed their own internal (or industry standard) security measures they would have discovered this.

101.    The majority of the named Plaintiffs were damaged in the full amount of the face value of the checks stolen and converted from them. Very few of the named Plaintiffs has recovered any of their converted and stolen funds to date.

102.    Each instrument belonging to a named Plaintiff was converted when a Defendant Bank obtained and made payment for the instrument to a person not entitled to enforce the instrument or receive payment for it (Carpenter and/or one of his co-conspirators, agents or employees). None of the named Plaintiffs were the issuers or acceptors of those instruments, as those terms are defined in Chapter 1303 of the O.R.C. All of the named Plaintiffs who were the payees of their instruments received delivery of them either directly or through an agent.

46

## COUNT II AIDING AND ABETTING CARPENTER'S TORTIOUS CONDUCT
### (As to All Defendant Depository banks)

103.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 102 as if fully rewritten herein.

104.    The Defendant depository banks had knowledge that Carpenter's conduct and the conduct Carpenter requested of them, constituted a breach of duties these banks owed to the Plaintiffs. This knowledge is represented by the internal security measures maintained by the Defendant Depository Banks, especially those concerning the opening of new business entity checking accounts for strangers. The banks knew that their failure to adhere to these measures exposed governments, society and individuals, like the Plaintiffs, to potential harm from tax cheats, alimony cheats, money launderers for the drug cartels, money launderers for organized crime, check kiters and criminals and Ponzi artists, like Carpenter.

105.    The Depository banks' duties to the Plaintiffs included, but were not limited to, their legal duties to refrain from allowing Ponzi artists to open up corporate checking accounts for non-existent companies and to negotiate checks made out to non-existent companies.

106.    The Defendant depository banks provided substantial assistance to Carpenter in carrying out his scheme of fraud and conversion, including but not limited to:  negotiating numerous very large checks made out to a non-existent companies;  opening corporate checking accounts in the name of non-existent companies; depositing checks bearing the name of one corporation into a corporate checking account titled to another name, and by opening business checking accounts a stranger who refused to present facially valid corporate banking authorization resolution and or properly filled out corporate checking account signature cards.

47

107. Defendant depository banks' acts aiding and abetting Carpenter's fraud scheme was a proximate cause of all of the plaintiffs' loss These acts by the depository banks was the proximate cause of millions of dollars of damages to the Plaintiffs named in paragraph 16, above and to all of their sub-class members.

### COUNT III VIOLATION OF R.C. 1304.30 IMPROPERLY PAYING AN INSTRUMENT/DEBITING AN ACCOUNT (AS TO THE DEFENDANT DRAWEE BANKS)

108. Plaintiffs incorporate the allegations in paragraphs 1 through 107 as if fully rewritten herein.

109. The named plaintiffs listed in paragraph nineteen (19) were at all times relevant, customers of the defendant drawee banks listed in paragraph eighteen (18), above.

110. Plaintiffs' checks were paid into accounts that were not authorized to be opened in the name of Lomas or Serengeti. They were paid into accounts opened and controlled by a disbarred felon formerly convicted of bank fraud.

111. These accounts were wrongfully opened and wrongfully maintained by the defendant depository banks.

112. Plaintiffs' checks were therefore not paid as authorized by the defendant drawee banks and consequently were items that were not "properly payable." This is *res judicata* due to Carpenter's criminal conviction, as described and alleged in para. 1.

113. In accordance with O.R.C. § 1304.30 and other applicable statutes, the drawee banks were required to re-credit or otherwise refund the amount of these named plaintiffs' items and then recover their losses, if at all, from Carpenter and the depository banks.

114. To date, no drawee bank has refunded any of these named plaintiffs the value of their improperly paid checks.

48

115.  Plaintiffs were injured when the defendant drawee banks improperly paid these items, and will remain so damaged until they are reimbursed according to statute.

**WHEREFORE**, Plaintiffs request this Court award judgment against Defendants as follows:

COUNT I: the face amount of all checks belonging to the Plaintiffs and converted by the individual defendant depositary bank, as well as consequential damages, punitive damages, attorney's fees, pre and/or post judgment interest, and such other relief as this Court deems just and proper.

**Count II:** the face amount of each check belonging to a Plaintiff and improperly negotiated and laundered by an individual defendant depositary bank, as well as consequential damages, punitive damages, attorney's fees, pre and/or post judgment interest, and such other relief as this Court deems just and proper.

**Count III:**  the face amount of all checks belonging to the Plaintiffs and improperly paid by an individual defendant drawee bank, as well as pre and/or post judgment interest, and any such other relief as this Court deems just and proper.

Respectfully submitted,

Daniel G. Morris, Esq. (0040449)
The Law Offices of Daniel G. Morris
P.O. Box 609192
4205 Woodbridge Ave.
Cleveland, Ohio  44109
Tel:  (216) 939-8593
Fax:  (216) 961-6462
E-mail:  daniel.g.morris@us.army.mil
Attorney for the Interveners

49

## JURY DEMAND

Plaintiffs demand a trial by a jury, on all issues of fact and law so triable to a jury.

Daniel G\ Morris
Attorney for the P